UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>24-CR-20168-ALTONAGA(s)</u>

UNITED STATES OF AMERICA

v.

JOSEPH JULES PLANCHER,

    Defendant.

_____/

**UNITED STATES OF AMERICA'S RESPONSE TO
<u>THE COURT'S ORDER TO SHOW CAUSE</u>**

    The United States of America, by and through the undersigned Assistant United States Attorney, hereby responds to the Court's Order that the United States show cause why it should not be required to pay a monetary penalty due to the late disclosure of discovery (the "Order"). (DE:115). Understanding the Court's frustration, the United States respectfully submits that a monetary sanction is not appropriate in this case because the government's late disclosure was inadvertent and mostly duplicative, and any prejudice has been cured by the significant remedy of ordering a mistrial. (*See infra Section IIB*). Additionally, there is no legal authority to order monetary sanctions in response to a discovery violation against the government in a criminal case. (*See infra Section IIA*).

    **I. PROCEDURAL HISTORY & FACTUAL BACKGROUND**

    *A. Pre-Trial Background*

    In July 2022, law enforcement discovered and seized 23 firearms and over 4,000 rounds of ammunition from a vessel, the Pap-Pa-Dap Plus, that was outbound from Miami, Florida, to Miragoâne, Haiti. In May 2023, the United States Attorney's Office for the Southern District of Florida opened an investigation related to the attempted smuggling and exportation of firearms. At

1

that time, the lead case agent from Homeland Security Investigations ("HSI") provided initial investigative materials. On August 9, 2023, the prosecutor asked the case agent to provide an update on all outstanding evidence, including, but not limited to, "Any and all reports authored by law enforcement; . . . any and all video/audio recordings; . . . any and all photographs associated with the investigation." (*See* Ex. A). The case agent subsequently provided a hard drive containing the evidence for this case, which was in turn provided to the Defendant post-indictment.

While preparing to indict this case, the prosecutor regularly met with the case agent to discuss the evidence in the agency's possession, and to ensure that the prosecutor had received all case-related materials. During that process, the prosecutor specifically asked for any and all video recordings related to the investigation, to include any surveillance video footage. The case agent confirmed that the prosecutor had received all evidence related to this case and that no surveillance video footage existed.

On April 4, 2024, a grand jury in the Southern District of Florida returned an indictment charging co-defendants Samuel Pierre and Reginald Louis Chosson with: one count of Conspiracy to Smuggle Firearms Outside of the United States and to Purchase Firearms by Means of a False Statement, in violation of Title 18, United States Code, Section 371 (Count 1); and two counts of Purchase of Firearms by Means of a False Statement, in violation of Title 18, United States Code, Section 922(a)(6) (Counts 2 & 3). (DE:3). On August 13, 2024, a grand jury in the Southern District of Florida returned a superseding indictment charging the Defendant, along with his co-defendants, in Count 1. (DE:28).

In response to the entry of the Standing Discovery Orders (DE:11; 18; 42; 44; 45), the prosecutor again communicated with the case agent to confirm all discoverable materials had been provided to the United States Attorney's Office. The case agent confirmed that all materials had

been provided to the prosecutor. The United States shared discovery with the Defendant as follows:

- On September 20, 2024, the United States shared discovery with the Defendant via file-sharing site USAfx, which included Bates-stamped documents SP_0001 through and including SP_4239. (DE:46).

- After the first discovery production, the United States received additional materials from the case agent, which the prosecutor in turn produced to the Defendant on November 7, 2024, to include Bates-stamped documents SP_4240 through and including SP_4551.

- On December 4, 2024, the prosecutor produced the following: (a) a corrected final report of investigation; (b) the full DNA testing case file, Bates-stamped SP_4552 through and including SP_6385; and (c) a set of reports that were pulled by the Defendant's computer forensic expert while at the HSI office on November 21, 2024.[1]

- On December 10, 2024, upon receipt of search warrant returns from the Apple iCloud account of an unindicted co-conspirator, the United States produced communications between the Defendant and the unindicted co-conspirator.

This Court set trial for the two-week period beginning on January 13, 2025. Prior to trial beginning, on January 8, 2025, the undersigned received additional images from the case agent, that were taken by the agent during the surveillance and arrest of the Defendants. On January 13, 2025, the undersigned received images taken by Customs and Border Protection ("CBP") officers that had not been previously provided to the Defendant.[2] The undersigned produced these items to the Defendant on January 8, 2025, and January 14, 2025.[3] The undersigned was unaware of the existence of these items prior January 8, 2025. In response to this disclosure, the undersigned again

---

[1] The United States advised the Defendant that all seized cell phones were available for inspection and review at the agency, including those belonging to unindicted third-party individuals. (DE:46; 62).

[2] The images received from the CBP officers appeared duplicative of images previously produced to the Defendant.

[3] The production on January 14, 2025, included images received on January 8, 2025, taken by the agent during the surveillance and the arrest of co-defendant Reginald Louis Chosson, and images of the business address of an unindicted individual; as well as images received on January 13, 2025, from CBP officers that were taken during the initial seizure of firearms and ammunition. The production on January 8, 2025, included images taken by the agent during the surveillance and arrest of the Defendant as well as images taken during the seizure of firearms. The delay in providing some of the images received on January 8, 2025, was a result of the review process undertaken by the undersigned to ensure the images did not include sensitive material related to the third-party individuals. Ultimately, the undersigned determined that all of the images should be produced to the Defendant.

3

communicated to all law enforcement officers involved in this investigation, including the case agent, that *any and all* existing documents, images, or notes related to this investigation should be produced to the undersigned as soon as possible.

In preparing for trial, the undersigned also requested from all witnesses any written statements related to this case. The undersigned specified that this request included any text messages, emails, notes, or other written materials.

B. *Trial Proceedings*

During the first day of trial, on January 15, 2025, four CBP officers testified. On cross-examination, defense counsel questioned the officers as to whether they had collected any surveillance camera videos from the dock or knew if any existed. Each officer testified that that they either did not request or could not remember if they had requested surveillance videos. Some of the officers made clear that collection of evidence was not within their role in this particular seizure. One officer testified that he would be surprised to learn—even if there were surveillance cameras on the dock—that those cameras were operable. None of the officers affirmatively denied the existence of any surveillance videos, again, because that information was not within their purview or knowledge.[4] The final witness of the day was a computer forensic agent from HSI. That agent had no involvement in the seizure in this case, and his only role was assisting with conducting a forensic extraction of a cell phone.

After court concluded for the day, the prosecutors and case agent returned to the United States Attorney's Office to prepare for the following day of trial. Around 6:00 p.m., the prosecutor and the case agent called the original and now-retired case agent, Manuel Fajin.

---

[4] The government notes that this representation is based on its own recollection, and not based on the trial transcript. As of the date of this filing, the government has not yet received the transcript from the trial proceedings on January 15, 2025, initially requested on January 21, 2025.

4

Because of cross-examination from the first day of trial, the prosecutors and case agent called Mr. Fajin to again confirm that no surveillance video from the dock or the vessel existed. During that conversation, Mr. Fajin indicated that he did not recall any surveillance videos existing related to this case. Subsequently, Mr. Fajin called back and conveyed that, upon further reflection, he thought there might be surveillance video related to this case but could not be sure. Mr. Fajin noted that as part of the Marine Smuggling group, he had several investigations related to the Miami River seaport, and that his memory of surveillance video might relate to one of those other investigations. Mr. Fajin explained, however, that it was his practice to save surveillance videos, if there were any, in a folder within an online file-sharing site, maintained by Immigration and Customs Enforcement.

Hearing Mr. Fajin's reference to the file-sharing site led the case agent to search through his emails where he located an email sharing a link to a folder on this file-sharing site (the "Shared Folder"). At that time, the case agent recalled Mr. Fajin sharing the Shared Folder with him. Upon opening the Shared Folder, the case agent located several items—none of which included any surveillance video—and began going through the items to determine what they were, as he had not seen the Shared Folder recently.[5] The Shared Folder included images, internal administrative documents, draft versions of the initial report of investigation, and intelligence information that was gathered related to names of individuals that agents encountered in the investigation. (*See* Ex. B). At that time, the undersigned directed the case agent to share the entirety of the Shared Folder with the prosecutors so that they could review the items and determine what, if anything, had not already been produced to the Defendant.

The undersigned received the materials at approximately 9:30 p.m. on January 15, 2025.

---

[5] The case agent later determined that he had not accessed the Shared Folder since December 2023.

Upon receiving the items in the Shared Folder, the government promptly reviewed the items. In light of the late hour and the fact that the trial in the case had already begun, the undersigned provided nearly everything from the Shared Folder to the defense, erring on the side of disclosure, and excluding only those files which were obviously exact duplicates of materials already provided. Based on the government's review, the government also quickly summarized the items, highlighting two documents that appeared to contain discoverable information not yet provided to the Defendant. (*See* Ex. C, Ex. D, and Ex. E). The disclosure also included information regarding Mr. Fajin's memory of possible surveillance video, which had not previously been captured in any written form and was only learned by the case agent and the prosecutors the same evening it was disclosed to the defense.

In total, the January 16th disclosure included approximately 190 images, 5 videos, 3 excel sheets, and 17 documents. Having now reviewed each file more closely, the government can represent that of the 190 images:

- Approximately 130 were duplicates of images already provided in discovery;
- Approximately 40 images are near-duplicates, extremely similar to images already in discovery, or contain information or items already included in discovery in some form;
- Approximately 10 images are checks from the Florida Highway Safety and Motor Vehicles Driver and Vehicle Information Database (DAVID); and
- Approximately 10 images are additional images of seized evidence.

The disclosure also included five video files that are the "live" version of images already included in discovery and three excel files that reflect the internal property item numbers of the seized evidence – material that was provided to the defense in other formats.

Of the 17 documents included in the disclosure, only two contained any substance that was

6

new, and discoverable. (*See* Ex. D, Ex. E).[6] One of those documents contained images generated from a license plate reader that were described in a report that had already been included in discovery at Bates number SP_0098, however the images were not made part of the report. (*See* Ex. E). One such image purportedly belonged to an individual named "Denise Pierre Charles." This individual's information was collected at the start of the investigation. Her name and date of birth were also included, albeit redacted, in a report produced on September 20, 2024 (SP_0066–SP_0076).

    The other document, titled "Exec draft" and attached as Government's Exhibit D, was largely duplicative of the final version of the first report of investigation that had already been included in discovery. However, it contained the names of six individuals that were not included in the final version of the report of investigation, four of which were apparently employees of the vessel, the fifth was the owner of the dock, and the sixth was the person who would maintain surveillance video at the dock. The "Exec draft" document did not state whether any of those individuals had knowledge of the incident or whether surveillance video existed. After reviewing Exhibit D, the case agent was not sure if he had authored the document. On the morning of the second day of trial, the undersigned and the case agent again spoke with the prior case agent, Mr. Fajin, who stated that he had not authored the document. Upon conducting another search of his emails, the case agent located an email he sent to Mr. Fajin on July 13, 2022, which he believes captured his notes from the initial days of the seizure. (*See* Ex. F). After locating this email, the case agent recalled having authored the content that was ultimately included in the document "Exec

---

[6] Ten of the 17 documents were duplicative, in form or in substance, of items already provided in discovery. Five of the documents, including Government's Exhibit E, were largely duplicative of each other, containing the biographical information of several individuals involved in the case. One document was an administrative email between HSI employees.

draft."[7]

The four apparent vessel employees listed in the "Exec draft" were listed as individuals that were not present when the case agent was present but who may have relevant information. However, the "Exec draft" included no confirmation that they had any relevant information at the time the document was drafted. Three of those four individuals' names, along with the name of the owner of the dock, were already included in previously produced discovery, listed numerous times in the gate security logs at Bates numbers SP_0004 and SP_0035. The "Exec draft" additionally included a phone number for four of these individuals.[8] The name of an individual who would be the point of contact to discuss surveillance videos, if any existed, was listed in the "Exec draft" as employed by the Seacoast property where the vessel was docked, not as an employee for the vessel. The surveillance videos in question would have seemingly depicted that of the security gate, and potentially the exterior of the vessel, but not the interior of the vessel. The "Exec draft" did not state that anyone had been able to review any surveillance videos or that any existed, and explained that the case agent had been told any surveillance videos would be written over after five days.[9]

On the morning of the second day of trial, the Defendant moved *ore tenus* for a mistrial.

---

[7] The "Exec draft" also referred to a separate investigation that was unrelated to this investigation but noted that the other investigation also involved the same dock.

[8] The government notes that in court during the Defendant's request for a mistrial, defense counsel stated that the vessel employees listed in Exhibit D were previously unknown to the defense. At the time, the government did not immediately recognize the names and conveyed to the Court that it had no reason to believe that was not true. However, upon reviewing the items and cross-referencing with the existing discovery, the government confirmed that all but two of the names in "Exec draft" were previously included in discovery that the Defendant received in the first production on September 20, 2024. (Bates numbers SP_0004 through SP_0035).

[9] In the course of preparing this response to the Court's Order, the undersigned have been in communication with the case agent to ascertain what transpired. As a result of this process, the undersigned learned of four additional reports of the investigation that the agent inadvertently failed to provide to the government in advance of trial. The undersigned received these materials on January 27, 2025, and produced them to the Defendant the following day. (*See* Ex. G at ¶ 16).

This Court granted the motion for a mistrial based on the production of discovery following the first day of trial. (*See* Ex. I). On the same day, the Court ordered that the United States show cause why it should not be required to pay a monetary penalty. (DE:115).

II. **ARGUMENT**

As the Court stated in granting the motion for a mistrial on January 16, 2025, "[A]ny of us facing a charge that carries a day of imprisonment would want to have all information before trial, not during." (*See* Ex. I at 15). Though this Court did not make a formal finding that the United States violated Rule 16, the United States appreciates the seriousness of this inadvertent, but late disclosure. The late disclosure resulted from an unintentional oversight, and though serious, the law imposes limits on a district court's ability to impose financial penalties against the government. The undersigned acted in good faith in producing the late discovery immediately after receiving the material. Further, this Court has addressed and cured any prejudice resulting from the late disclosure in granting the Defendant's *ore tenus* motion for a mistrial.

   A. <u>The principle of sovereign immunity prevents a district court from imposing financial penalties against the government in response to late disclosure of discovery materials.</u>

The principle of sovereign immunity precludes a district court from imposing financial penalties against the government in response to the late disclosure of discovery, even where the late disclosure is a violation of Rule 16. In *United States v. Horn*, the First Circuit explained that:

> fee-shifting against the government can be accomplished only in conjunction with the passage of a statute (or a sufficiently explicit rule having the force of a statute) that authorizes such an award. In the absence of such an enactment, the secondary principle of sovereign immunity saves the federal government harmless from all court-imposed monetary assessments, regardless of their timing and purpose.

*United States v. Horn*, 29 F.3d 754, 767 (1st Cir. 1994). The First Circuit expressly rejected the claim that a district court has an inherent or supervisory power to order financial sanctions—

assessing costs or other penalties—against the government for criminal discovery violations.

It is true that, as the Court noted in its Order, the *Horn* court considered the two "clash[ing]" doctrines of supervisory power and sovereign immunity as they apply generally to litigants and stated that as a general rule, courts have the supervisory power to assess fees "against either parties or their attorneys in befitting situations." *Id*. at 759–60. But the First Circuit did not end its analysis there. It proceeded to analyze how this general rule applies in the specific context where one of the parties is the federal government. After doing so, the *Horn* court made clear that sovereign immunity trumps a court's supervisory power when the sanctioned party is the federal government. The *Horn* court reasoned:

> [W]e believe that sovereign immunity ordinarily will trump supervisory power in a head-to-head confrontation. The critical determinant is that the doctrines are of fundamentally different character: supervisory powers are discretionary and carefully circumscribed; sovereign immunity is mandatory and absolute. Consequently, whereas the former may be invoked in the absence of an applicable statute, the latter must be invoked in the absence of an applicable statute; and whereas the former may be tempered by a court to impose certain remedial measures and to withhold others, the latter must be applied mechanically, come what may.

*Id*. at 764. The *Horn* court went on to consider three possible reasons why sovereign immunity might not apply to the government but concluded that "none of the various possible detours manage to bypass the barrier of sovereign immunity." *Id*. at 767.

The Ninth Circuit addressed a similar issue, albeit ultimately relying on different reasoning, in *United States v. Woodley*. 9 F.3d 774 (9th Cir. 1993). Essentially, that court held that: (1) Rule 16(d)(2) does not empower a court to sanction the government for criminal discovery violations; and (2) while a court might have supervisory power to order sanctions, the fact that Rule 16 "allots specific remedies for its violation eliminates any justification for an exercise of supervisory power to create any other remedy for it." *Id*. at 782.

Though case law forecloses sanctioning the federal government monetarily pursuant to

Rule 16(d)(2) or the Court's inherent supervisory powers, the passage of a statute, such as the Hyde Amendment, empowers the Court to impose monetary sanctions against the federal government in specifically enumerated circumstances. Pub. L. No. 105–119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes). The Hyde Amendment provides that a court may award reasonable attorney's fees when "the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an aware unjust." *Id*.

While the Hyde Amendment provides an avenue wherein a court may impose monetary sanctions against the government in the event of a wrongful prosecution, it does not permit such a sanction for the late disclosure of discovery. In a single-judge opinion denying an en banc rehearing, now-Chief Judge Pryor considered whether monetary penalties against the government were permitted under the Hyde Amendment and explained that:

> as a sanction of prosecutors for discovery violations, a district court can prohibit the government from introducing the undisclosed evidence or "enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2)(C)–(D). A court also can publically reprimand prosecutors for misconduct . . . . But a court can grant the extraordinary remedy of an award of attorney's fees only when it establishes that a wrongful prosecution has occurred. No comparable remedy existed before the enactment of the Hyde Amendment.

*United States v. Shaygan*, 676 F.3d 1237, 1242–43 (11th Cir. 2012) (Pryor, J., respecting the denial of en banc rehearing). "The Hyde Amendment allows for the extraordinary remedy of invading the public fisc to pay an acquitted criminal defendant's attorney's fees," but "this rare waiver of sovereign immunity applies only when a court determines that the entire position of the United States was vexatious, frivolous, or in bad faith." *Id*. at 1239 (quotations omitted). Here, the Defendant has not prevailed at any stage of the prosecution, and has alleged only discovery violations, not that the entire case was frivolous or in bad faith.

> B. *Even if a district court could impose monetary sanctions, no such sanction is appropriate as the government's late disclosure was inadvertent and not in bad faith.*

Even if a district court could impose monetary sanctions against the federal government for a discovery violation, no such sanction is appropriate here because the government's late disclosure was inadvertent and not in bad faith. As discussed above, the discovery in this case was voluminous. Throughout the investigation and the prosecution of the case, the government regularly confirmed that it had in its possession all potentially discoverable materials. Unfortunately, a handful of items never made their way from the Shared Folder into the agency's case management system, and despite the government's best efforts to collect all discovery from the agency, it was not able to do so. Upon learning of the Shared Folder during the evening of the first day of trial, the prosecutors promptly had the case agent send all files included and began downloading and reviewing the files. Once it appeared that at least some of the items might contain new information, the prosecutors immediately turned over everything, less a few documents that were obviously duplicates. To help guide the defense, the government shared its initial findings in an email that outlined what the disclosure was and specifically attached two documents it believed might contain new information.

The decision to provide everything to the defense as soon as possible may have created an initial appearance that the government was providing a late disclosure of a significant amount of "new" discovery (approximately 190 images, 5 videos, 3 excel sheets, and 17 documents). But that is not the case. As soon as it was able to do so, after the Court granted the Defendant's motion for a mistrial and court concluded on January 16th, the government began closely examining each item to determine whether it was, in fact, new and discoverable. The government included the findings of its review above to specify precisely what the late discovery consisted of and to show that the vast majority of the material produced on January 16, 2025, were either duplicates, in

substance or in form, or were items that were not discoverable.

The truly new discoverable material provided to the defense after the first day of trial, as summarized above, was minimal. Nothing about the evidence already possessed by the prosecutors would have suggested that anything was missing from the discovery. The prosecutors were aware that there was no surveillance video in this case. As it relates to the images, it appears that several law enforcement officers, from different law enforcement entities, were present at varying times on the vessel during the three-day seizure, and some took photographs with their phones that were not ultimately consolidated into the formal case file in the Investigative Case Management ("ICM") system maintained by HSI. But it would not have been obvious to anyone reviewing the file that there was anything missing, and it would have been nearly impossible to know that additional images were taken that had not been included in the case file and provided to the defense in discovery.

In sum, despite the government's diligent efforts to gather all discovery from the agency, the above items were not provided to the United States Attorney's Office. Immediately upon learning after the first day of trial of the existence of additional items that were potentially discoverable, the prosecutors provided them to defense counsel. In doing so, the prosecutors tried to summarize the contents of the disclosure, and to highlight the items that appeared to be new. Ultimately, a very small percentage of the items were truly new. The prosecutors acted in good faith to obtain and produce all discoverable materials, nothing was intentionally withheld from the defense, the late discovery production here was inadvertent, and the prosecutors acted diligently to produce the additional discovery as soon they learned about it. On these facts, the government submits that no monetary penalty would be appropriate, even if a district court had the authority

to impose one.[10]

## CONCLUSION

For the foregoing reasons, the United States of America respectfully requests that this Court not impose a monetary penalty on the government.

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

Date: January 29, 2025     By:     /s/ *Audrey Pence Tomanelli*
                                   Assistant United States Attorney
                                   Court ID No.: A5503001
                                   99 NE 4th Street, 6th Floor
                                   Miami, Florida 33132
                                   Tel: (305) 961-9031
                                   Email: Audrey.Pence.Tomanelli@usdoj.gov

                           By:     /s/ *Lindsey Maultasch*
                                   Assistant United States Attorney
                                   Court ID No.: A5502705
                                   99 NE 4th Street, 6th Floor
                                   Miami, Florida 33132
                                   Tel: (305) 961-9115
                                   Email: Lindsey.Maultasch@usdoj.gov

---

[10] The government would also submit that any prejudice that can be attributed to the late disclosure has already been cured by the Court's granting of the Defendant's motion for a mistrial, and no other sanctions are necessary for an inadvertent mistake. Though district courts have broad discretion "concerning the imposition of a Rule 16(d)(2) sanction for the violation of a discovery order," there are several factors that courts must consider, including: "the reasons for the Government's delay in affording the required discovery, the extent of prejudice, if any, the defendant has suffered because of the delay, and the feasibility of curing such prejudice by granting a continuance or, if the jury has been sworn and the trial has begun, a recess." *United States v. Fernandez*, 780 F.2d 1573, 1576 (11th Cir. 1986) (internal citations omitted). "[I]f [a district court] decides a sanction is in order, [it] 'should impose the least severe sanction that will accomplish the desired result—prompt and full compliance with the court's discovery orders.'" *Id.*; *see also United States v. Euceda-Hernandez*, 768 F.2d 1307, 1311–12 (11th Cir. 1985).

14

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed on this 29th day of January 2025 with the Clerk of the Court using CM/ECF. I further certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Audrey Pence Tomanelli*
Audrey Pence Tomanelli
Assistant United States Attorney